**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| BARRY AHURUONYE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-2061 (RBW) |
| | ) | |
| UNITED STATES | ) | |
| DEPARTMENT OF INTERIOR, <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>**MEMORANDUM OPINION**</u>

The plaintiff, Barry Ahuruonye, proceeding <u>pro se</u>, brings this civil action against the

defendants, the United States Department of Interior (the "Department") and Doug Burgum,[1] in

his official capacity as Secretary of the Interior, pursuant to Title VII of the Civil Rights Act of

1964 ("Title VII"), 42 U.S.C. § 2000e <u>et seq.</u>, and the Rehabilitation Act of 1973 (the

"Rehabilitation Act"), 29 U.S.C. § 791 <u>et seq.</u>  <u>See</u> Plaintiff's Amended Complaint #2 ("2d Am.

Compl.") at 3, ECF No. 47.  Currently pending before the Court is the defendant's motion to

dismiss the plaintiff's Second Amended Complaint.[2]  <u>See generally</u> Motion to Dismiss and

Memorandum in Support Thereof ("Def.'s Mot."), ECF No. 50.  Upon careful consideration of

the plaintiff's Second Amended Complaint, his other submissions in this case, and the

---

[1] Doug Burgum is the current Secretary of the Interior, and he is therefore substituted for Deb Haaland as the proper party defendant pursuant to Federal Rule of Civil Procedure 25(d).

[2] The plaintiff's Second Amended Complaint names both the Department and the Secretary of the Interior as defendants.  <u>See</u> Plaintiff's Amended Complaint #2 at 9, ECF No. 47.  Because it is well-established that "[t]he only proper defendant in a Title VII suit . . . is the head of the department, agency, or unit in which the allegedly discriminatory acts transpired[,]" <u>Hackley v. Roudebush</u>, 520 F.2d 108, 115 n.17 (D.C. Cir. 1975) (internal quotation marks omitted), the Court must dismiss the plaintiff's Title VII claims against the Department itself.  Accordingly, the Court will refer to the Secretary of the Interior as the sole defendant throughout this Memorandum Opinion and Order.

defendant's submissions,[3] the Court concludes for the following reasons that it must grant in part and deny in part the defendant's motion.

## I.        BACKGROUND

### A.        Factual and Administrative Background

The Court generally outlined the factual background of this case in its earlier Memorandum Opinion issued on March 5, 2025, and, therefore, will not reiterate every fact contained in that opinion here. See Ahuruonye v. U.S. Dep't of Interior, No. 17-cv-2061 (RBW), 2025 WL 707576, at *1–2 (D.D.C. Mar. 5, 2025). The Court will, however, set forth in more detail the facts that remain pertinent to the resolution of the defendant's motion to dismiss the plaintiff's Second Amended Complaint.

The plaintiff identifies himself as an African American male of Nigerian national origin, who in December 2011, was hired as a Grants Management Specialist, GS-1109-12, in the Department's United States Fish and Wildlife Service ("FWS"), until his termination in April 2015. See Appellant's Amended Complaint ("Am. Compl."), Exhibit ("Ex.") 2 (Ahuruonye v. Dep't of Interior, No. DC-0752-13-0384-C-1, at 1 (M.S.P.B. Mar. 28, 2014) ("MSPB 2014 Decision")), ECF No. 11-2; Ahuruonye v. U.S. Dep't of Interior, No. 16-cv-1767 (RBW), 2022 WL 1746656, at *1 (D.D.C. May 31, 2022) (Walton, J.). Relevant here, the plaintiff was initially "terminat[ed] from his term appointment [ ] to the position of Grants Management Specialist, . . . effective December 3, 2012 . . . ." Am. Compl., Ex. 2 (MSPB 2014 Decision) at 1.

---

[3] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the plaintiff's Errata Exhibits submitted with his First Amended Complaint ("Pl.'s Errata Exs."), see Appellant's Errata to Submit Exhibit #11, ECF No. 15; (2) the Plaintiff's Errata Exhibits ("Pl.'s 2d Errata Exs."), ECF No. 38; (3) the Plaintiff['s] Opposition to Defendant's Motion to Dismiss the Amended Complaint Case 17-2061 (RBW) ("Pl.'s Opp'n"), ECF No. 51; and (4) the Reply in Further Support of Defendant's Motion to Dismiss ("Def.'s Reply"), ECF No. 54.

Following the plaintiff's administrative appeal of the Department's termination of his employment, the parties entered into a settlement agreement on April 5, 2013, pursuant to which the defendant agreed to reinstate the plaintiff to his former position and pay him back pay and benefits he would have accrued during the period when he was terminated, see id., but on June 20, 2013, the plaintiff filed a Petition for Enforcement with the Merit Systems Protection Board ("MSPB"), alleging that the Department had not complied with the terms of their settlement agreement, see Am. Compl. at 3. On March 28, 2014, the MSPB denied the plaintiff's petition for enforcement of the agreement after concluding that the Department "ha[d] established that it is in compliance with the April 5, 2013 Settlement Agreement." Id., Ex. 2 (MSPB 2014 Decision), at 8.

Separately, the plaintiff also pursued an administrative appeal, culminating in an appeal before the Equal Employment Opportunity Commission ("EEOC"), which affirmed the Department's final decision regarding his claims. See generally Trevor F. v. Zinke, EEOC Doc 0120150183, 2017 WL 3393856 (EEOC Jul. 28, 2017). The plaintiff has also filed several other lawsuits in this Court and other courts relating to his employment with the defendant, which the Court consolidated and subsequently dismissed. See Ahuruonye v. Dep't of Interior, No. 16-cv-1767 (RBW), 2022 WL 1746656, at *1 (D.D.C. May 31, 2022), aff'd, No. 22-5239 (D.C. Cir. 24, 2023), cert. denied, 144 S. Ct. 1064 (2024); see also Ahuruonye v. Dep't of Interior, No. 16-cv-1767 (RBW), 2024 WL 5041997, at *2–3 (Sept. 30, 2024), aff'd, No. 24-5229 (D.C. Cir. Jan. 31, 2025) (denying the plaintiff's motion to set aside and vacate its prior summary judgment order as void).

### 1. The Plaintiff's Claims in this Case

In this case, the plaintiff "primarily seek[s] judicial review of the EEOC Appeal No. 0120150183[,]" 2d Am. Compl. at 3; see also Trevor F., 2017 WL 3393856, in which the

plaintiff alleges that he was subjected to fourteen discriminatory and retaliatory actions by his supervisors between May and November 2013, see 2d Am. Compl. at 3–5 (listing the actions that form the basis of his claims in this case).  The Court will briefly detail each of these claims, largely in chronological order, rather than in the order set forth in the Second Amended Complaint.[4]

### a.   The Defendant's Alleged Failure to Promote the Plaintiff (Claim 3)

The plaintiff alleges that, upon his reinstatement pursuant to the April 2013 settlement agreement, he "was not promoted to [the position of] Grants Specialist," which was a GS-13 position.  Id. at 4; see Trevor F., 2017 WL 3393856, at *1.  Although the settlement agreement by its own terms provided that the plaintiff would be reinstated at GS-12, step 1, see Pl.'s 2d Errata Exs., Ex. 1 (Ahuruonye v. Dep't of Interior, No. DC-0752-13-0384-C-1, at 8 (M.S.P.B. Apr. 15, 2013) ("MSPB 2013 Decision")), ECF No. 38 (appending settlement agreement),[5] the plaintiff alleges that "he was told by Human Resources (['])HR[']) that after one year, he would be promoted to GS-13 without further competition based on [his] performance[,]" see 2d Am. Compl. at 17.

### b.   The Plaintiff's Attempts to Communicate with the Office of the Inspector General (Claims 5 and 7)

The plaintiff further alleges that in May 2013, he was prevented from accessing the Coastal Impact Assistance Program ("CIAP") offices and from communicating with the Office

---

[4] In his Second Amended Complaint, the plaintiff does not include a Claim 6 and includes two different claims identified as Claim 9.  For the sake of clarity, the Court adopts the plaintiff's numbering of his claims, with the exception of the duplicate claims identified as Claim 9, which the Court will identify as Claim 9 and Claim 9(2), consistent with the defendant's references to those claims.

[5] Although the parties cite to the plaintiff's Second Errata as originally entered in error on June 20, 2024, see Plaintiff['s] Amended Complaint of August 16, 2023, Errata Adding Exhibits 1-9 on June 14, 2024, ECF No. 22, the Court refers to these same exhibits as having been accepted by the Court and entered on the docket on October 1, 2024, see Pl.'s 2d Errata Exs.

of the Inspector General ("OIG").  Id. at 4.  According to the plaintiff, he was informed by a

security guard on May 6, 2013, that "he was not allowed to enter" the CIAP office, id. at 35, and

that "[t]he agency changed the CIAP office's entrance key to prevent the plaintiff from getting

resources to provide an informed response to an OIG auditor[,]" id. at 36.  On May 7, 2013, the

plaintiff's first-line supervisor, Lisa Van Alstyne, allegedly "blocked him from providing

information to auditors who were going state to state to audit grant projects."  Id. (citation

omitted).  The plaintiff states that "not only was he kept out of his own office to meet with the

auditors, but he was instructed by Ms. Van Alstyne not to meet with them," id., which the

plaintiff alleges "was contrary to what his position description required him to do[,]"[6] id.

c.  **The Plaintiff's "Unrealistic" Performance Plan and Questioning Regarding His**
    **EEO Complaint (Claims 4 and 13)**

The plaintiff next alleges that, on June 10, 2013, Ms. Van Alstyne provided him with

"unrealistic performance standards" on his Employee Performance Appraisal Plan ("EPAP").  Id.

at 28.  The plaintiff asserts that this unfair EPAP was "[b]ased exclusively on" standards

regarding the entry of information into the Wildlife Tracking and Reporting Actions for the

Conservation of Species ("TRACS") platform, which the Department had not yet received

authorization to use.  See id. at 28–29.

Then, on June 25, 2013, during an EPAP meeting, "Ms. Van Alstyne [allegedly]

questioned [the plaintiff] about his harassment and discrimination complaint, asked him why he

---

[6] In his opposition, the plaintiff also appears to allege that in June 2013, he was subjected to "an involuntary and forced transfer from" the CIAP to the Wildlife and Sport Fish Restoration ("WSFR") division, Pl.'s Opp'n at 32, based on a series of emails he received during June and July 2013, emphasizing that he was assigned to the WSFR and not the CIAP, see id. at 31–32.  The plaintiff further appears to allege that as part of this reassignment, he was stripped of his grants management duties at the CIAP and assigned to enter information into the TRACS system, see id. at 31, which he argues was in contravention of his position description, see id. at 30.  However, the plaintiff does not appear to provide any further information about the circumstances of his reassignment or any other changes to his employment as a result of the alleged reassignment.  See id. at 30–32.

was complaining about harassment, and asked him to sign his EPAP." Id. at 46.  The plaintiff

alleges that "he felt he was under duress from her and he refused to sign his EPAP while under

duress."  Id.

### d.  The Plaintiff's Requests to Telework (Claims 1, 2, 8, and 12)

The plaintiff alleges that he had been informed on June 10, 2013, that he had been

approved for one day per week of telework on a probationary basis, see id. at 9–10, but that on

June 13, 2013,[7] the probationary telework authorization was rescinded after he "had informed

the agency through [Ms.] Van Alstyne that he [would] be filing an EEO complaint[,]" see id. at

10.  In her e-mail to the plaintiff, Ms. Van Alstyne purportedly noted that "the decision of

management based on [Department of Interior] and [FWS] policy [was] that [the plaintiff was]

not eligible for telework at this time[,]" id. at 13 (citing Pl.'s 2d Errata Exs., Ex. 9 (Errata E-

Mails) at 12, ECF No. 38-9), because the plaintiff "ha[d] not met the required performance

qualifications[,]" Pl.'s 2d Errata Exs., Ex. 9 (Errata E-Mails) at 12.

Then, on July 10, 2013, Ms. Van Alstyne allegedly "disapproved [the plaintiff's]

reasonable accommodation request" for two days per week of telework, id. at 14, which he

submitted on April 25, 2013, see id. at 13.  According to the plaintiff, his request for a reasonable

accommodation was based on his "work related stress of syncope that leads to fainting episodes

like the one [he experienced on May 15, 2013, while] at work as well as outbreak of hives[,]" id.

at 15; his desire for fewer distractions, see id.; and his desire to "cut down on the stress of [his]

long commute time and cut commuting cost[s] for the government[,]" id.  The plaintiff

represents that he "provided a note from his physician in support of his request[,]" id., which

---

[7] Although the plaintiff alleges that the rescission took place on July 13, 2013, his submissions containing the relevant e-mail exchanges indicate that this occurred on June 13, 2013.  See Pl.'s 2d Errata Exs., Ex. 9 (Errata E-Mails) at 10, ECF No. 38-9.

noted that he was "having stress-related syncope" and "would benefit from working at home part-time[,]" id. In response, Ms. Van Alstyne purportedly "asked [the plaintiff] for medical documentation[,]" id. at 14, and subsequently "denied his request, using various conflicting reasons, indicating that it was against Agency policy and that he stated he 'did not need' to telework[,]" id. at 14–15. According to the plaintiff, "there [were] at least two other Caucasian employees . . . who [were] allowed to telework without medical requirements." Id. at 15.

The plaintiff next contends that, on August 6, 2013, Ms. Van Alstyne "threatened him with an adverse personnel action[] if he [ ] failed to produce medical documentation" in support of his reasonable accommodation request by August 10, 2013. Id. at 37. The plaintiff asserts that the information sought by management was inapplicable to his position and that this request was made in order "to make the [plaintiff's reasonable accommodation] process more difficult." Id. Subsequently, on August 25, 2013, Ms. Van Alstyne again allegedly denied his reasonable accommodation request for telework two days per week due to his syncope, apparently because his supervisors determined "that his medical documentation was not sufficient . . . ." Id. at 44.

The plaintiff represents that, in December 2013, after he was reassigned to a new supervisor, he was approved for telework two days per week based on the same medical documentation. See id. at 16 (citing Am. Compl., Ex. 5 (Letter from Penny L. Bartnicki, Chief, Coastal Impact Assistance Program Branch, to Barry Ahuruonye at 1 (Dec. 26, 2013)), ECF No. 11-5).

### e. The Alleged Termination of the Plaintiff's Health Benefits Coverage (Claim 9(2))

The plaintiff also alleges that on July 8, 2013, he received a letter from his health insurance provider, Blue Cross/Blue Shield, notifying him that "his coverage had been terminated as of [April 7, 2013]," allegedly based on the Department's termination of "his

7

coverage in the Federal Employees Health Benefit Program . . . ."  Id. at 40.  The plaintiff alleges that "his insurance was fixed two months later and he continued to receive bills for those two months he was out of coverage."  Id. at 41 (citation omitted).  The plaintiff also appears to argue that the Department continued to deduct health care coverage premiums from his salary during the period when his coverage had been erroneously terminated.  See id. at 41.

### f.   The Plaintiff's Writing Assignment (Claim 9)

The plaintiff next alleges that "[o]n July 31, 2013, he was required to write an email 'essay' to the State liaisons and [Ms. Van Alstyne] that w[ould] be judged and subjected to scrutiny[,]" id. at 39, and that this assignment was given only to him and no other employee, see id.  He further contends that although he was told that the essay's subject "was to come up with things that might be helpful for the trainers or developers [of the] TRACS[ platform,]" id. at 40, the essay assignment "was an opportunity to document minor, clerical errors, and to use them to document [the plaintiff's] performance issues[,]" id. at 39.

### g.   Ms. Van Alstyne's Alleged False Accusations of Absenteeism (Claim 10)

The plaintiff also alleges that "on August 29, 2013, [Ms. Van Alstyne] . . . falsely accused him of not being at his [ ] duty station for an extended period . . . ."  Id. at 42.  The plaintiff represents that he responded to Ms. Alstyne's accusations, noting that she was "in a meeting . . . when [he] arrived at work . . . and [she] should have seen him because [he] saw [her,]" and further, that although she "claimed that [she] did not see [the plaintiff] until noon" that day, she had "interrupted [his] discussion with" a colleague that morning.  Id.

### h.  The Department's Alleged Failure to Investigate the Plaintiff's Accusations (Claim 11)

Next, the plaintiff alleges that, on September 3, 2013, in response to Ms. Van Alstyne's accusations regarding his absence from his duty station, he submitted a letter to Stephen Barton, another supervisor, see id. at 43, detailing his "complaint of harassment, bullying[,] and hostile work environment against Ms. [ ] Van Alstyne[,]" id. at 44.  However, the plaintiff alleges that Mr. Barton "failed to investigate his concerns[,]" id. at 43, and that "the issues actually worsened" because "Ms. Van Alstyne was given a free hand to harass and discriminate against him[,]" id. at 43–44.  He further contends that Mr. "Barton had falsely testified [during the EEOC appeal] that [the] plaintiff 'never directly delivered to him an allegation of harassment . . . .'"  Id. at 44.  Allegedly in response to the plaintiff's report, he was reassigned back to the supervision of Penny Bartnicki.  See id. (citing Pl.'s 2d Errata Exs., Ex. 9 (Final Agency Decision, Ahuruonye v. Jewell, Agency Case No. DOI-FWS-13-0329) at 16, ECF No. 38-10).

### i.  The Letter of Reprimand (Claim 14)

Finally, the plaintiff alleges that, on November 19, 2013, after his supervision was transferred back to Penny Bartnicki, Ms. Bartnicki "issued him a letter of reprimand."  Id. at 47.  Specifically, the plaintiff alleges that, upon returning from sick leave on October 18, 2013, he sent Ms. Bartnicki an email indicating that he had been informed by the payroll department that Ms. Bartnicki had instructed them "not to process [the plaintiff's] payroll."  Id.  He alleges that Ms. Bartnicki "singled him out to the payroll unit[,]" id. (citation omitted), and that her letter of reprimand "was an attack against him because of his disability because the only reason he would not be able to enter his time would be if a medical situation kept him away from work[,]" id.  He

9

further appears to indicate that Ms. Bartnicki's letter of reprimand "took place not long after [she] was interviewed concerning [the plaintiff's] EEO complaint." Id.

## B.    Procedural Background

The Court has already detailed much of the relevant procedural history of this long-running matter, and, therefore, will only briefly discuss the procedural posture of this case following the issuance of that earlier Memorandum Opinion.

On March 5, 2025, the Court granted in part and denied in part the plaintiff's motion to further amend his complaint over the defendant's objection and denied the defendant's then-pending motion to dismiss the Amended Complaint as moot. See Order at 1 (Mar. 5, 2025), ECF No. 43. Specifically, the Court granted the plaintiff's motion to further amend his complaint to the extent that it sought to amend the complaint to conform with the fourteen discrimination and retaliation claims he brought in his EEOC appeal, but denied his motion to the extent it sought to include discrimination claims based on his national origin and hostile work environment allegations. Id.

Then, on April 3, 2025, the Court granted the plaintiff's motion for leave to file his out-of-time Second Amended Complaint, see Order at 4 (Apr. 3, 2025), ECF No. 45, but denied the plaintiff's request that the Court reconsider in part its March 5, 2025, Order, insofar as it dismissed without prejudice his national origin and hostile work environment claims, see id. at 4–5. Rather than order the plaintiff to refile yet again his Second Amended Complaint, the Court "sua sponte dismiss[ed] without prejudice all counts against the defendant to the extent that the plaintiff seeks to bring claims of discrimination based on national origin and hostile work environment, consistent with its prior Order denying the plaintiff leave to file these claims." Id. at 4.

10

On August 5, 2025, the defendant filed his motion to dismiss the plaintiff's Second Amended Complaint.  See Def.'s Mot. at 1.  On August 18, 2025, the plaintiff filed his opposition to the defendant's motion to dismiss, see Pl.'s Opp'n at 1, and on September 4, 2025, the defendant filed his reply in further support of his motion to dismiss, see Def.'s Reply at 1.

## II.  STANDARD OF REVIEW

### A.  Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests whether a complaint has properly "state[d] a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable interference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).

In evaluating a motion to dismiss under Rule 12(b)(6), "the Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged."  Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted).  While the Court must "assume [the] veracity" of any "well-pleaded factual allegations" in a complaint, conclusory allegations "are not entitled to the assumption of truth."  Iqbal, 556 U.S. at 679.  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678 (citing Twombly, 550 U.S. at 555).  Also, the Court need not "accept legal conclusions cast as factual allegations[,]" or "inferences drawn by [the] plaintiff if those inferences are not supported by the

11

facts set out in the complaint[.]" Hettinga, 677 F.3d at 476. The Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice." Equal Emp. Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997). However, the Court need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." Kaempe v. Myers, 367 F.3d 958, 963 (D.C. Cir. 2004) (citation omitted).

B.      **Pro Se Parties**

In applying the above framework, the Court is mindful that the pleadings of pro se parties are "to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotation marks and citations omitted). Furthermore, all factual allegations by a pro se litigant, whether contained in the complaint or other filings in the matter, should be read together in considering whether to grant a motion to dismiss. See Richardson v. United States, 193 F.3d 545, 548 (D.C. Cir. 1999); Brown v. Whole Foods Mkt. Grp., Inc., 789 F.3d 146, 152 (D.C. Cir. 2015) (concluding the same in the context of a motion to dismiss pursuant to Rule 12(b)(6)). Nonetheless, a "pro se complaint, like any other, must present a claim upon which relief can be granted by the court." Crisafi v. Holland, 655 F.2d 1305, 1308 (D.C. Cir. 1981).

### III.      ANALYSIS

The defendant argues that the Court should dismiss the plaintiff's claims because each fails to state a claim. See Def.'s Mot. at 12. In opposition, the plaintiff argues that (1) the defendant has conceded all of his claims because it failed to respond to his requests for

admission, see Pl.'s Opp'n at 6–10;[8] and (2) that, in any event, he has plausibly alleged each of

his claims pursuant to Title VII and the Rehabilitation Act, see generally Pl.'s Opp'n.[9]  In reply,

the defendant argues that the plaintiff has conceded many of his claims because he failed to

respond to the defendant's arguments presented in his motion to dismiss.  See Def.'s Reply at 3,

4, 9, 10, 11, 13, 14.  While the Court agrees that it could treat these arguments as conceded due

to the plaintiff's failure to respond to the defendant's arguments in his opposition, the Court will

nonetheless address the defendant's arguments out of an abundance of caution and in light of the

plaintiff's pro se status.[10]  Because the plaintiff does not distinguish between his discrimination

and retaliation claims, the Court will first describe the relevant frameworks for assessing claims

of discrimination and retaliation, and then it will determine whether the plaintiff has adequately

established each of his claims under either framework.

---

[8] As the Court has already concluded, because the defendant had no obligation to respond to the plaintiff's requests before discovery, he did not concede these claims, see Order at 3–4 (Apr. 3, 2025), ECF No. 45, and therefore the plaintiff's position is incorrect.

[9] Although the Court previously dismissed the components of the plaintiff's Second Amended Complaint relating to his hostile work environment and national origin claims, in his opposition, the plaintiff continues to assert allegations of hostile work environment and discrimination based on his national origin.  See generally Pl.'s Opp'n. However, even if the Court were to consider the plaintiff's allegations in his opposition, he has set forth no factual allegations that he was discriminated against based on his national origin (as opposed to his race), and he has provided no factual allegations from which the Court could infer a "severe and pervasive" pattern of harassment as opposed to an effort "to 'bootstrap' his alleged discrete acts of discrimination . . . into a broader hostile work environment claim[,]" Rattigan v. Gonzales, 503 F. Supp. 2d 56, 81 (D.D.C. 2007), especially because he does not identify the bases for liability as to any of the acts.

[10] The defendant also argues in his reply that "[t]he Court may elect not to consider [the p]laintiff's arguments that exceed the forty-five page limit" as noted in the Court's General Order.  See Def.'s Reply at 1 n.1.  Moreover, the defendant notes that, because the plaintiff has already submitted lengthy exhibits to his complaints and opposition in this case, the Court could convert the defendant's motion to a motion for summary judgment and allow the defendant to submit supplemental briefing as to "the Department's legitimate, non-discriminatory reasons for taking each action [the p]laintiff challenges as discriminatory or retaliatory."  See id.  While the Court appreciates the defendant's desire to expeditiously resolve this longstanding matter, the Court declines to convert the defendant's motion to dismiss into a motion for summary judgment because the plaintiff was not put on notice that the Court may convert the defendant's motion, and in any event, the plaintiff—despite his voluminous exhibits—has not been permitted to engage in discovery.  See Hamilton v. Geithner, 743 F. Supp. 2d 1, 8 (D.D.C. 2010) (Walton, J.), aff'd, 666 F.3d 1344 (D.C. Cir. 2012) (holding that the Court may convert a motion to dismiss into a motion for summary judgment if it "is satisfied that the parties are not taken by surprise or deprived of a reasonable opportunity to contest facts averred outside the pleadings and the issues involved are discrete and dispositive").

## A.      Title VII Discrimination Claims

Title VII of the Civil Rights Act of 1964 states that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . ." 42 U.S.C. § 2000e-2(a)(1).  A plaintiff alleging discrimination under Title VII must therefore show that "(i) [he] suffered an adverse employment action (ii) because of [his] race, color, religion, sex, [or] national origin[.]" Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (citing 42 U.S.C. § 2000e-16(a)).

In Chambers v. District of Columbia, the District of Columbia Circuit noted that an adverse employment action is one that alters the "terms, conditions, or privileges of employment." 35 F.4th 870, 872 (D.C. Cir. 2022).[11]  The phrase "terms, conditions, or privileges of employment" is intentionally broad because it "evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment[.]" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)).  The Supreme Court has recently clarified that an adverse employment action is one that causes "some harm." Muldrow v. City of St. Louis, 601 U.S. 346, 354–55

---

[11] The defendant argues that the Supreme Court's rationale in Babb v. Wilkie, 589 U.S. 399 (2020), and not Chambers, controls this case, see Def.'s Mot. at 8–9.  In Babb, the Supreme Court assumed that the definition of "personnel action" in the section of the Age Discrimination in Employment Act ("ADEA") mirrored the definition of "personnel action" contained in the Civil Service Reform Act ("CSRA").  589 U.S. at 405–06.  Thus, the defendant argues that because Title VII's federal-sector provisions also use this same term, they too must parallel the CSRA's definition, which would impose a more stringent standard for harm than that set forth in Chambers in the private-sector context.  See Def.'s Mot. at 8–9.

As the defendant notes, this Court has previously indicated that "[a]lthough these two Title VII provisions differ in their precise language, the District of Columbia Circuit has held that 'the two contain identical prohibitions.'" Ahuruonye, 2022 WL 1746656, at *5 (quoting Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007)).  And since the Court's prior application of identical standards under these circumstances, other members of this Court have routinely rejected arguments to apply Babb's rationale to Title VII cases.  See Wilson v. Noem, No. 20-cv-100 (GMH), 2025 WL 1000666, at *22 (D.D.C. Apr. 3, 2025) (listing cases).  Thus, the Court declines to accept the defendant's invitation to reconsider its prior conclusion that binding legal authority directs it to construe Title VII's federal and non-federal provisions identically.

14

(2024).  Further, a plaintiff must plead only that an alleged adverse employment action "gives rise to an inference of discrimination."  Walker v. Johnson, 798 F.3d 1085, 1091 (D.C. Cir. 2015) (citing Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002)).

## B.      Rehabilitation Act Claims

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination" by a federal agency.  29 U.S.C. § 794(a).  To state a claim of disability discrimination under the Rehabilitation Act, the plaintiff must allege that "(1) [he] was a qualified individual with a disability[;] (2) [his] employer knew of [his] disability[;] and (3) [he] suffered an adverse employment action because of [his] disability."  Congress v. District of Columbia, 324 F. Supp. 3d 164, 175 (D.D.C. 2018).  As in the Title VII context, an adverse employment action is one that causes "some harm."  Muldrow, 601 U.S. at 354–55; see Castiglione v. Bunch, No. 23-cv-2274 (LLA), 2025 WL 843280, at *8 (noting that "courts in this Circuit have 'long interpreted' Title VII and the Rehabilitation Act in parallel") (quoting Bain v. Off. of Att'y Gen., 648 F. Supp. 3d 19, 51 (D.D.C. 2022)).

Additionally, the Rehabilitation Act, which incorporates the standards of the Americans with Disabilities Act ("ADA"), requires employers to make reasonable accommodations "to the known physical or mental limitations of an otherwise qualified individual with a disability who is an [ ] employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship[.]"  42 U.S.C. § 12112(b)(5)(A); see Minter v. District of Columbia, 809 F.3d 66, 69 (D.C. Cir. 2015) (applying ADA standards to a claim under the Rehabilitation Act).  To establish a failure to accommodate prima facie case, a plaintiff must show that

> (1) [ ] he . . . was an individual who had a disability within the meaning of the [Rehabilitation Act]; (2) [ ] the employer had notice of the disability; (3) [ ] with

15

[a] reasonable accommodation the employee could perform the essential functions of the position; and (4) [ ] the employer refused to make such accommodations.

Buie v. Berrien, 85 F. Supp. 3d 161, 171–72 (D.D.C. 2015) (quoting Brown v. Snow, 407 F. Supp. 2d 61, 67 (D.D.C. 2005)). "[A]n employer is not required to provide an employee th[e] accommodation he requests or prefers, the employer need only provide some reasonable accommodation." Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1305 (D.C. Cir. 1998) (quoting Gile v. United Airlines, Inc., 95 F.3d 492, 499 (7th Cir. 1996)). "The employee has the burden of identifying reasonable accommodations, and the [employer] has the burden of showing undue hardship." Graffius v. Shinseki, 672 F. Supp. 2d 119, 126 (D.D.C. 2009).

**C.      Retaliation Claims**

Under Title VII's anti-retaliation provision,

> [i]t shall be an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing[.]

42 U.S.C. § 2000e-3(a). "The anti-retaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms[,]" Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 54 (2006) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997)), and "protects an individual not from all retaliation, but from retaliation that produce[d] an injury or harm[,]" id. at 67.

To establish a claim for retaliation under Title VII, a plaintiff must show: "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009). And, "the plaintiff bears the burden of establishing that the [defendant's] improper motive 'was the "but-for" cause of the employer's adverse decision.'" Green v.

16

Haaland, No. 21-cv-329 (RDM), 2022 WL 898864, at *9 (D.D.C. Mar. 28, 2022) (quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009)).  "This means that to survive a motion to dismiss a Title VII retaliation claim, the plaintiff must allege 'sufficient factual matter, accepted as true,' to permit the 'reasonable inference' that the defendant's retaliatory animus was the but-for cause of the challenged employment action."  Id. (quoting Iqbal, 556 U.S. at 678).  "In the retaliation context, an adverse action is one that is 'harmful to the point that [the employer's action] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  Harris v. Mayorkas, No. 21-cv-1083 (GMH), 2022 WL 3452316, at *11 (D.D.C. Aug. 18, 2022) (alteration in original) (quoting Burlington N. & Santa Fe Ry., 548 U.S. at 57).  And, "[t]he elements of retaliation . . . claims are the same under Title VII and the Rehabilitation Act."  Doak v. Johnson, 19 F. Supp. 3d 259, 280 (D.D.C. 2014), aff'd, Doak v. Johnson, 798 F.3d 1096 (D.C. Cir. 2015).

**D.     Whether the Plaintiff Has Adequately Pleaded His Claims**

**1.  The Recission of the Plaintiff's Probationary Telework-Related Claim (Claim 1)**

The Court first addresses the plaintiff's allegations regarding the June 13, 2013 rescission of his probationary telework arrangement, which had been approved on June 10, 2013.  See 2d Am. Compl. at 9–10.  The defendant first argues that the Court must dismiss this claim because the Department ultimately approved his requested telework in December 2013, and, in any event, his claim fails because he has failed to adequately plead that: (1) he suffered an adverse employment action to support his discrimination claim; and (2) the rescission of his telework arrangement was based on discriminatory or retaliatory animus.  See Def.'s Mot. at 12–13.

Courts in this district have routinely concluded that "[a]lthough rescinding or suspending an employee's approved telework schedule or refusing to permit an employee to engage in telework to which he is otherwise entitled may well be an adverse action, . . . merely refusing an

17

employee's request to telework is not, because there is no 'identifiable term or condition of employment' that has been harmed by the denial." Wilson v. Noem, No. 20-cv-100 (GHM), 2025 WL 1000666, at *22 (D.D.C. Apr. 3, 2025) (quoting Muldrow, 601 U.S. at 347). In other words, the rescission or suspension of a telework arrangement, where the employee is already teleworking, creates a "change[] [in] the structure of an employee's workday[,]" id. (quoting Miller v. O'Malley, No. 20 C 2118, 2024 WL 4240443, at *4 (N.D. Ill. Sept. 19, 2024)), whereas, on the other hand, a denial of a request to begin teleworking does not create "an effective change in [the] plaintiff's existing work schedule[,]" id. (quoting Black v. Guzman, No. 22-cv-1873 (BAH), 2023 WL 3055427, at *8 (D.D.C. Apr. 24, 2023)). The same is true in the retaliation claim context. See id. (listing cases).

Here, the Court concludes that the plaintiff has failed to establish that the rescission of his approved telework schedule three days after its approval, but before the plaintiff began to work remotely, constituted an adverse action or materially adverse action for the purposes of his discrimination and retaliation claims. Specifically, because the plaintiff had not yet begun to telework, the rescission did not create "an effective change in [his] existing work schedule[,]" Black, 2023 WL 3055427, at *8, such that it would have caused "some harm" to his employment, Muldrow, 601 U.S. at 347, or other material adversity arising out of the request to work remotely, see Burlington N. & Santa Fe Ry., 548 U.S. at 57.[12] Accordingly, the Court must dismiss the components of the plaintiff's discrimination and retaliation claims regarding the rescission of his probationary telework arrangement.

---

[12] Although the defendant argues that the plaintiff's claim fails because his request to telework was ultimately granted in December 2023, as described below, at this stage, it appears that the plaintiff submitted a new request to a different supervisor, and it was that request that was ultimately approved. See infra Sec. III.D.2.

### 2. The Plaintiff's Remaining Telework Claims (Claims 2, 8, 12)

The Court next addresses the plaintiff's claims regarding the defendant's purported denial of his request for a reasonable accommodation of telework, i.e.: (1) the July 10, 2013, denial of his reasonable accommodation request for telework; (2) Ms. Van Alstyne's requests for medical documentation in support of his request; and (3) Ms. Van Alstyne's denial of his reasonable accommodation request for the second time on August 25, 2013.

As indicated above, to establish a failure to accommodate claim under the Rehabilitation Act, the plaintiff must show that the defendant refused his reasonable accommodation request.[13] See Buie, 85 F. Supp. 3d at 171–72.  And, "[a]n employer is not required to provide an accommodation prior to receiving medical documentation that substantiates the employee's need for accommodation."  Graffius, 672 F. Supp. 2d at 130.  This includes "gather[ing] sufficient information from the employee requesting the reasonable accommodation and from qualified experts 'as needed to determine what accommodations are necessary.'"  Id. (citing Carroll v. England, 321 F. Supp. 2d 58, 69 (D.D.C. 2004)).

Rather, "[t]he Rehabilitation Act contemplates an 'interactive process,'" Ali v. Pruitt, 727 F. App'x 692, 695 (D.C. Cir. 2018) (per curiam) (citing 29 C.F.R. § 1630.2(o)(3)), which is "a flexible give-and-take between employer and employee so that together they can determine what accommodation would enable the employee to continue working[,]" Ward v. McDonald, 762 F.3d 24, 32 (D.C. Cir. 2014) (internal quotation marks omitted).  "Both parties must engage in this interactive process in good faith, and neither 'should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability.'"  Weatherspoon v. Azar, 380 F.

---

[13] The defendant does not appear to dispute that the plaintiff has met the first two elements required for his Rehabilitation Act claim, i.e., that he was a qualified individual with a disability and that the defendant had notice of that disability.  Therefore, the Court does need not address these elements.

Supp. 3d 65, 74 (D.D.C. 2019) (quoting Ward, 762 F.3d at 32).  Accordingly, "[t]o determine whether the employer held up its end of the bargain, courts look to factors such as whether the employer 'obstructs or delays the interactive process' or 'fails to communicate, by way of initiation or response.'"  Id. (quoting Ward, 762 F.3d at 32).  Essentially, "courts should attempt to isolate the cause of the breakdown[,]" which, for instance, could occur "when the parties are missing information that can only be provided by one of the parties[; in such situations,] the party withholding the information may be found to have obstructed the process."  Ward, 762 F.3d at 32 (internal quotation marks omitted).  Put succinctly, "to establish that h[is] request [for a reasonable accommodation] was 'denied,' [the plaintiff] must show either that the [defendant] in fact ended the interactive process or that it participated in the process in bad faith."  Id.

Here, although the plaintiff at times appears to allege that he was denied a reasonable accommodation request on July 10, 2013, it is unclear to the Court that his request was in fact denied at that point, or whether the plaintiff is alleging that Ms. Van Alstyne's June 10, 2013, email, indicating that she would approve one day a week of telework constituted a denial of his reasonable accommodation request for two telework days per week.  Because the email contains no reference to a reasonable accommodation request, see Pl.'s 2d Errata Exs., Ex. 9 (Errata Emails) at 12, ECF No. 38-9,[14] and because Ms. Van Alstyne subsequently requested that the plaintiff submit additional medical information in support of his reasonable accommodation request, see 2d Am. Compl. at 37, the Court concludes that the plaintiff has not plausibly alleged

---

[14] Although the plaintiff takes issue with the Court's consideration of these emails as proof of the Department's legitimate reason for denying his request, see Pl.'s Opp'n at 12, the Court rejects his opposition because the plaintiff has incorporated these emails by reference into his Second Amended Complaint because he quotes and cites to these emails throughout the complaint and his opposition, see, e.g., 2d Am. Compl. at 9–10; Pl.'s Opp'n at 13–14, 44, and because the wording of Ms. Van Alstyne's email is integral to the plaintiff's claim that she denied his telework request as a reasonable accommodation, see Banneker Ventures, LLC, v. Graham, 798 F.3d 1119, 1133 (D.C. Cir. 2015) (quoting Kaempe v. Myers, 367 F.3d 958, 965 (D.C. Cir. 2004)).

that his reasonable accommodation request was denied on either July 10, 2013, or June 10, 2013, to the extent that his position is that Ms. Van Alstyne's email represented a denial of his reasonable accommodation request.

The defendant also argues that the Court must dismiss the plaintiff's reasonable accommodation claim relating to the alleged denial of his telework request in August 2013, arguing that the plaintiff's request was ultimately approved in December 2013.  See Def.'s Mot. at 13.  However, it appears to the Court that the plaintiff submitted a new request to Ms. Bartnicki in December 2013, and it was that request that was approved.  See Am. Compl., Ex. 5 (Letter from Barry Ahuruonye to Penny L. Bartnicki at 1 (Dec. 20, 2013)), ECF No. 11-5). Indeed, the Final Agency Decision indicates that the plaintiff was informed on August 22, 2013, that he was being offered an accommodation, but not a telework accommodation as requested.[15] See Pl.'s 2d Errata Exs., Ex. 9 (Final Agency Decision, Ahuruonye v. Jewell, Agency Case No. DOI-FWS-13-0329) at 9–10.  Thus, based on the current record, it at least appears that the plaintiff's initial request for a reasonable telework accommodation was denied by Ms. Van Alstyne and that an identical request based on the same medical documentation was subsequently approved by a different supervisor several months later.  Therefore, the Court concludes that dismissal of the plaintiff's failure to accommodate claim is premature.[16]

Finally, although the plaintiff does not appear to allege that these actions constituted discrimination or retaliation under Title VII, for the same reasons stated above, see supra Sec.

---

[15] As indicated above, neither party objects to the Court's consideration of these materials or their authenticity, and consideration of the factual timeline in the Final Agency Decision is appropriate because "the question of whether the requested accommodations were granted is 'fundamental' to [the plaintiff's] claim . . . ."  Porfiri v. Eraso, 121 F. Supp. 3d 188, 196 (D.D.C. 2015) (quoting Flemmings v. Howard Univ., 198 F.3d 857, 861 (D.C. Cir. 1999)).

[16] Because the Court concludes that it appears that the plaintiff's request for reasonable telework accommodations was initially denied, it need not at this time address any alternative claim that the defendant failed to participate in the interactive process in good faith by allegedly requesting inapplicable medical documentation in support of that request.

III.D.a., the denial of his requests to telework fails under those frameworks as well. Further, Ms. Van Alstyne's request for medical documentation in order to determine an appropriate accommodation for the plaintiff does not constitute an adverse action or materially adverse employment action for the purposes of any Title VII claim, absent the plaintiff showing that he suffered "some harm" to his employment, Muldrow, 601 U.S. at 347, or other material adversity arising from that request, see Burlington N. & Santa Fe Ry., 548 U.S. at 57. Thus, to the extent that the plaintiff seeks to raise Title VII claims as opposed to Rehabilitation Act claims, those claims fail.

Accordingly, the Court must dismiss the components of the plaintiff's Title VII discrimination and retaliation claims regarding his allegations that he was denied a teleworking arrangement as a reasonable accommodation on July 10, 2013, and again in August 2013, as well as his allegation regarding Ms. Van Alstyne's requests for medical documentation in support of his request. The Court must also dismiss the component of the plaintiff's Rehabilitation Act claim regarding the alleged denial of a reasonable accommodation request on July 10, 2013. However, the Court will deny the defendant's motion to dismiss the component of the plaintiff's Rehabilitation Act claim regarding Ms. Van Alstyne's request for medical documentation and her subsequent denial of his reasonable accommodation request on August 25, 2013.

### 3. Failure to Promote the Plaintiff to a GS-13 Grants Specialist Position (Claim 3)

The Court next addresses the plaintiff's claim that he was discriminated and retaliated against because he was not promoted to the GS-13 Grants Specialist position upon his reinstatement by the Department. See 2d Am. Compl. at 4. The defendant argues that this claim must be dismissed because: (1) to the extent that the plaintiff alleges that the Department breached the terms of the Settlement Agreement, this Court lacks jurisdiction to consider those arguments, see Def.'s Mot. at 16; (2) to the extent that the plaintiff seeks to challenge his initial

22

hiring in December 2011 at the GS-12 level as discriminatory, his claims are barred by the Settlement Agreement, see id.; and (3) to the extent that the plaintiff argues that the defendant's failure to promote him subsequent to his reinstatement was discriminatory or retaliatory, he has failed to allege sufficient facts to support this claim, see id. at 17.  In response, the plaintiff argues that this Court has jurisdiction to consider his failure-to-promote claim because the Department did not raise any objection to this claim during the EEOC administrative process, see Pl.'s Opp'n at 18; and, in any event, this claim is unrelated to the Settlement Agreement because it relates not to his reinstatement at the GS-12 level, but rather the Department's failure to promote him to the GS-13 level when he became eligible for the promotion on May 6, 2013, see id.  The Court will address these arguments in turn.

First, although the Court has federal question jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) to consider the plaintiff's Title VII and Rehabilitation Act claims, only the Court of Federal Claims has jurisdiction to entertain contract claims alleging damages above $10,000, as this claim does by alleging economic damages of at least $300,000, see 28 U.S.C. § 1491(a)(1); 2d Am. Compl. at 49.  And, as the District of Columbia Circuit has held, "even though Title VII might have been the basis of a settlement agreement, a breach claim is a straightforward contract dispute."  Greenhill v. Spellings, 482 F.3d 569, 575 (D.C. Cir. 2007) (citing Hansson v. Norton, 411 F.3d 231, 232 (D.C. Cir. 2005)) ("This court generally treats settlement agreements as contracts subject to the exclusive jurisdiction of the Court of Federal Claims.").  As indicated above, the plaintiff appears to argue that the Department "accepted" this claim and did not raise any objection to it during the administrative process, and therefore, this Court has jurisdiction to consider it.  See Pl.'s Opp'n at 18.  However, the plaintiff's reliance on what occurred during his administrative proceedings is not relevant to the Court's determination

23

of whether it has subject matter jurisdiction to adjudicate the claim. And, because the plaintiff alleges that he incurred damages above $10,000, to the extent that the plaintiff seeks to challenge his reinstatement at a GS-12 position pursuant to the terms of his settlement agreement, that component of his claims must be dismissed because such claims are "subject to the exclusive jurisdiction of the Court of Federal Claims." Greenhill, 482 F.3d at 575 (citing Hansson, 411 F.3d at 232).

Second, because the settlement agreement itself indicates that the plaintiff "agree[d] not to file any EEO complaints, MSPB appeals, grievances, or court actions, or initiate any other administrative or judicial proceedings concerning any matters he has filed or could have filed against the [Department] through the date of the execution of this Settlement Agreement[,]" Pl.'s 2d Errata Exs., Ex. 1 (MSPB 2013 Decision) at 9, i.e., April 5, 2013, he may not now challenge his initial hiring at the GS-12 level, see Moore v. Dep't of State, 351 F. Supp. 3d 76, 88 (D.D.C. 2019).

Finally, to the extent that the plaintiff alleges that the Department unlawfully failed to promote him to a GS-13 position shortly after his reinstatement at the GS-12 level, he has not provided any factual allegations establishing that the defendant denied him a promotion to an available position due to discriminatory or retaliatory animus. In his opposition, the plaintiff alleges that in late April or early May 2013, upon his reinstatement at the GS-12 level, he met with Mr. Barton "to discuss [a] Time-in Grade promotion to GS[-]13[,] but [Mr. Barton] was only interested in discussing paying $20[,000] for plaintiff to resign . . . ," Pl.'s Opp'n at 20, and that this refusal to promote him was based on "discriminatory and retaliatory animus by [Mr.]

Barton" resulting from a prior EEO complaint the plaintiff filed alleging discrimination by Ms. Bartnicki and Mr. Barton, id. at 22.[17]

For several reasons, the Court concludes that the plaintiff's allegations do not suffice, even at this early stage of the case.  First, the plaintiff's own allegations indicate that, far from being promised a promotion, he was actually told that his position "can be updated to a GS-13 after one year without further competition based on performance."  2d Am. Compl. at 17 (citation omitted) (emphases added).  Moreover, there are no well-pleaded facts in the Second Amended Complaint that would allow the Court to reasonably infer that the plaintiff was in fact qualified for a promotion to the GS-13 level position based on his performance subsequent to his reinstatement, such that the Court could reasonably infer that the defendant's failure to promote the plaintiff was due to discriminatory or retaliatory animus.  Finally, to the extent that the plaintiff appears to provide comparators in support of his claims to support such an inference, see 2d Am. Compl. at 21, he has not provided any "additional allegations showing [that] the comparators are in fact 'similarly situated' in some meaningful respect[,]" Joyner v. Morrison & Foerster LLP, 140 F.4th 523, 531 (D.C. Cir. 2025).  Accordingly, the Court concludes that it must dismiss the component of the plaintiff's Title VII claims relating to his non-promotion to a GS-13 grants specialist position.

### 4. The Plaintiff's Alleged "Unrealistic" Performance Appraisal Plan (Claim 4)

The Court next addresses the plaintiff's claim that his June 2013 EPAP contained unrealistic performance goals.  See 2d Am. Compl. at 28.  The defendant argues that this claim fails because "[t]his Court ha[s] already rejected [the p]laintiff's discrimination claims based on

---

[17] The plaintiff also appears to allege that Mr. Barton provided false testimony during the EEO process, based on allegations that Mr. Barton pleaded guilty to making false statements in an unrelated case.  See 2d Am. Compl. at 23–24.  However, even if these allegations are true, they do not raise a reasonable inference that Mr. Barton provided false information regarding the plaintiff.

the [Fiscal Year ('FY')] 2014 employee performance appraisal plan and subsequent unsatisfactory rating[,]" Def.'s Mot. at 19 (citing Ahuruonye, 2022 WL 1746656, at *9–11), and because the plaintiff has not alleged that he suffered any identifiable harm as a result of that EPAP, see id.  In response, the plaintiff argues that his claim in this case "has nothing to do with [the] FY 2014 performance appraisal plan or rating[,]" Pl.'s Opp'n at 25, and that the crux of his claim "is that the agency used [these] performance standards to coerce, intimidate, threaten, or interfere with [his] EEO protected activities[,]" id. at 26.

It appears to the Court that the plaintiff is correct that this claim relates to a 2013 EPAP and not his FY 2014 EPAP, which was issued by Penny Bartnicki after she became his supervisor again in September 2013.  See Ahuruonye, 2022 WL 1746656, at *2 (discussing the notification of standards for his FY 2014 EPAP, which was signed by Penny Bartnicki).  Instead, it appears to the Court that the plaintiff contends that this June 2013 EPAP was part of a scheme by his supervisors and that Stephen Barton "would have issued [ ] a [September 30, 2013] performance rating [based on the June 2013 EPAP] as pretext to remove [him] from federal employment."  2d Am. Compl. at 29–30.  However, as the plaintiff indicates, he was removed from Ms. Van Alstyne's supervision and transferred to Penny Bartnicki's supervision, see id. at 44, who appears to have issued the plaintiff the notification of standards for his FY 2014 EPAP, see Ahuruonye, 2022 WL 1746656, at *2.  Therefore, based on the plaintiff's own allegations in this case, the allegedly "unrealistic" performance appraisal plan issued to him in June 2013 did not cause him "some harm respecting an identifiable term or condition of employment" for the purpose of supporting his discrimination claim, Muldrow, 601 U.S. at 347, nor was it "harmful to the point that [the defendant's action] could well dissuade a reasonable worker from making or supporting a charge of discrimination[,]" and would thus support his retaliation claim, Burlington

26

N. & Santa Fe Ry., 548 U.S. at 57.  The Court therefore concludes that it must dismiss the components of the plaintiff's discrimination and retaliation claims regarding the EPAP issued to him in June 2013.

**5.  The Plaintiff's Communications with the OIG and His Involuntary Transfer (Claims 5 and 7)**

The Court next turns to the plaintiff's allegations that he was prevented from accessing the CIAP offices and from communicating with the OIG.  See 2d Am. Compl. at 4.  The defendant argues that the plaintiff has failed to establish that either of these actions are sufficiently adverse to support his discrimination and retaliation claims because, "following his reinstatement, [he] no longer was involved in the administration of grants under [the] OIG's review[ process,]" or in managing grants at all.  Def.'s Mot. at 20.  Therefore, according to the defendant, "[b]ecause [his] duties did not involve grants management, not being permitted to communicate with auditors" did not have any adverse effect on his employment.  Id.  The plaintiff responds that these actions were taken in tandem with "an involuntary and forced transfer from" the CIAP to the Wildlife and Sport Fish Restoration ("WSFR") division, Pl.'s Opp'n at 32, and that his proper job description required him to assist the OIG in audits of grants within his managing responsibilities, see id. at 28.  In reply, the defendant contends that although a transfer or reassignment can support discrimination and retaliation claims under Title VII, the plaintiff has failed to adequately allege that any transfer was based on racial discrimination or in retaliation for his protected activity.  See Def.'s Reply at 9.

The Court agrees that the plaintiff has not adequately alleged that being prevented from accessing the CIAP office or being told not to communicate with the OIG were sufficiently adverse to support his discrimination and retaliation claims.  First, although being locked out of one's office can constitute an adverse action, at least under circumstances where it "effectively

deprive[s]" the employee of his right to occupy his position and to the "use of an office and access to" other staff, see Yazzi v. Nat'l Org. for Women, 712 F. Supp. 3d 56, 78 (D.D.C. 2024), the plaintiff does not allege that being prevented from entering the CIAP offices on a single day deprived him of his ability to do his job, to access his own office, see id., or that it otherwise put him in a worse position. Second, although the plaintiff appears to argue that he was required to speak with the OIG regarding grants he was previously involved in, see Pl.'s Opp'n at 28, he does not allege that he was somehow harmed by his inability to communicate with the OIG, such as by being "deprived of information critical to [his] duties" or that this otherwise "interfered with [his] job performance[,]" Allen v. Napolitano, 774 F. Supp. 2d 186, 199–200 (D.D.C. 2011). Therefore, the Court concludes that the plaintiff has failed to establish that these actions caused him "some harm[,]" Muldrow, 601 U.S. at 354–55, or that they "would have dissuaded a reasonable worker from making or supporting a charge of discrimination[,]" Baloch, 550 F.3d at 1198.

The Court now turns to the plaintiff's allegation that he was subjected to an involuntary transfer from the CIAP to the WSFR at some point after he was reinstated pursuant to the Settlement Agreement. The Supreme Court recently clarified that, to bring a Title VII discrimination claim, an employee subjected to a job transfer must show that the transfer "brought about some 'disadvantageous' change in an employment term or condition[,]" Muldrow, 601 U.S. at 354 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)), but that he "does not have to show [ ] that the harm incurred was 'significant[,']" id. at 355. As the Supreme Court noted in Muldrow, "[m]any forced transfers" will satisfy this standard, such as where a plaintiff shows that he was assigned to a new, less-desirable job site, forced to change to a nighttime work schedule, or stripped of supervisory duties. Id. at 355–56.

28

And, in the context of retaliation claims, the plaintiff need only allege that the transfer would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68.

Here, the crux of the plaintiff's claimed harm appears to be that he was "stripped of all grant management job duties[,]" Pl.'s Opp'n at 27, and instead assigned to data entry tasks relating to the Wildlife TRACS system, see id. at 31 (citing Pl.'s 2d Errata Exs., Ex. 9 (Errata Emails) at 9 (noting that because "TRACS [was] not up and running for [the plaintiff's] use yet, . . . [his] job . . . [was] to prepare for TRACS by being ready to directly enter content" by entering project information in a placeholder template).  However, the plaintiff does not allege that this transfer or the reassignment of his duties "in any way affected [his] pay, grade, benefits, or opportunities for advancement[,]" Jones v. Bush, 160 F. Supp. 3d 325, 347 (D.D.C. 2016), aff'd, No. 16-5103, 2017 WL 2332595 (D.C. Cir. Feb. 21, 2017), or otherwise "brought about some 'disadvantageous' change in" the terms or conditions of his employment, Muldrow, 601 U.S. at 354 (quoting Oncale, 523 U.S. at 80), such as a different work schedule, the loss of supervisory authority, or a more difficult job site.  Nor does the plaintiff allege that he suffered any other harm, to the degree that it would "dissuade[] a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68.  At bottom, although the plaintiff "may be dissatisfied with the reassignments and change in supervisors, [ ] 'such intangible harms d[o] not . . . support a Title VII retaliation claim.'" Williams v. District of Columbia, No. 22-cv-2060 (TSC), 2025 WL 958221, at *8 (D.D.C. Mar. 31, 2025) (quoting Jones, 160 F. Supp. 3d at 344).

Accordingly, the Court concludes that it must dismiss the components of the plaintiff's discrimination and retaliation claims regarding his lack of access to the CIAP offices, his

supervisors' alleged actions that prevented him from communicating with OIG auditors, and his alleged involuntary transfer and reassignment of duties.

**6.  The Plaintiff's Claims Relating to Being Required to Draft an Email "Essay", Being Issued a Letter of Reprimand, and Being Accused of Leaving His Duty Station for an Extended Period of Time (Claims 9, 10, and 14)**

The Court next turns to the plaintiff's claims relating to: (1) Ms. Van Alstyne requiring him to draft an email, see 2d Am. Compl. at 39–40; (2) Ms. Bartnicki issuing him a letter of reprimand,[18] see id. at 47; and (3) Ms. Van Alstyne's accusation that he was absent from his duty station for a prolonged period of time,[19] see id. at 42.  For the following reasons, the Court concludes that the plaintiff has not alleged that any of these actions are sufficiently adverse to support his discrimination and retaliation claims.

First, the Court concludes that the plaintiff has failed to establish that the email drafting assignment constituted either an adverse employment action or a materially adverse action.  As previously indicated, the plaintiff alleges that "[o]n July 31, 2013, he was required to write an email 'essay' to the State liaisons and [Ms. Van Alstyne] that w[ould] be judged and subjected to scrutiny[,]" id. at 39, and that this assignment was given only to him and no other employee, see id.  He further contends that although he was told that the essay's subject "was to come up with things that might be helpful for the trainers or developers [of the] TRACS[ platform,]" id. at 40,

---

[18] Although the plaintiff at one point alleges that the letter of reprimand "was an attack against him because of his disability because the only reason he would not be able to enter his time would be if a medical situation kept him away from work[,]" 2d Am. Compl. at 47, the plaintiff throughout refers to this action as discrimination based on race and retaliation in response to his protected activity.

[19] As with several of his other claims, the plaintiff alleges that Mr. Barton provided false testimony during the EEO process in regards to the plaintiff's absence from his work station, based on allegations that Mr. Barton pleaded guilty to making false statements in an unrelated case, see 2d Am. Compl. at 42–43, but as the Court has previously noted, this allegation does not raise a reasonable inference that Mr. Barton provided false information regarding the plaintiff, see supra n.17.  And, to the extent that the plaintiff appears to argue that Mr. Barton's representations would be inadmissible under Federal Rule of Evidence 602 because he lacks "personal knowledge" that the plaintiff was absent from his duty station because of his allegedly false statements, see id. at 43 (citing Fed. R. Evid. 602), the plaintiff's arguments are misplaced because Mr. Barton has not provided any testimony in this case and the Court does not rely on any of his representations in resolving the defendant's motion to dismiss.

the essay assignment "was an opportunity to document minor, clerical errors, and to use them to document [the plaintiff's] performance issues[,]" id. at 39.  However, although the plaintiff alleges that the assignment was meant to provide a basis for criticism of his work, the plaintiff does not allege that he was in fact subjected to criticism of his work or some other harm by completing or failing to complete the assignment.  Moreover, to the extent that the plaintiff's claim could be liberally construed to argue that the assignment itself was indicative of excessive and discriminatory scrutiny of his performance, in the absence of any other alleged harm, the Court cannot conclude that being required to draft the email essay itself was sufficiently adverse because "[i]ncreased scrutiny at work does not qualify as a materially adverse action unless it 'is so extreme and intrusive as to constitute harassment in its own right[.]'" Caison v. Tulino, No. 23-cv-2414 (LLA), 2025 WL 947470, at *6 (D.D.C. Mar. 28, 2025) (quoting Aldrich v. Burwell, 197 F. Supp. 3d 124, 134 (D.D.C. 2016)).  Thus, without more, the plaintiff has failed to establish how being required to draft a single email—with no indication that he suffered any negative consequences as a result of that requirement and no allegation that the assignment of the task itself exceeded normal workplace scrutiny—can support his discrimination and retaliation claims.

Second, as to the letter of reprimand, "[e]ven post-Chambers (and post-Muldrow), courts have found that to be considered an adverse employment action, a letter of reprimand must lead to some deleterious change in the terms, conditions, or privileges of employment." Wilson, 2025 WL 1000666, at *24 (collecting cases).  And finally, in regards to Ms. Van Alstyne's allegedly false accusation that the plaintiff was absent from his workstation for a prolonged period, the D.C. Circuit has made clear that "false accusations without negative employment consequences are not employment decisions actionable under Title VII." Stewart v. Evans, 275 F.3d 1126,

31

1136 (D.C. Cir. 2002) (citation omitted).  Thus, because the Court concludes that the plaintiff has not alleged any harms arising from his letter of reprimand or Ms. Van Alstyne's duty station accusation, such that these actions caused him "some harm[,]" Muldrow, 601 U.S. at 354–55, or that they "would have dissuaded a reasonable worker from making or supporting a charge of discrimination[,]" Baloch, 550 F.3d at 1198, these claims fail.

Accordingly, the Court concludes that it must dismiss the components of the plaintiff's discrimination and retaliation claims relating to: (1) being required to draft the email, see 2d Am. Compl. at 39–40; (2) his letter of reprimand, see id. at 47; and (3) Ms. Van Alstyne's accusation that he was absent from his duty station for a prolonged period of time, see id. at 42.

### 7. The Alleged Temporary Termination of the Plaintiff's Health Benefit (Claim 9(2))

The Court next addresses the plaintiff's allegation that the defendant erroneously terminated "his coverage in the Federal Health Employees Health Benefit Program."  2d Am. Compl. at 40.  The defendant argues that the Court must dismiss the component of the plaintiff's claims regarding this allegation because he has failed to allege that the temporary termination of his benefits was caused by the defendant and not his health insurance provider, and that in any event, he has failed to show that these allegations create "an inference of discrimination."  Def.'s Mot. at 24 (citing Wiley v. Glassman, 511 F.3d 151, 155 (D.C. Cir. 2007)).  In response, the plaintiff argues that the emails he received regarding his health benefits coverage establish "that it was the [Department's] payroll/HR office in [the] plaintiff's Virginia[] office and not the insurance company that unlawfully cancelled [his] medical coverage . . . ."[20]  Pl.'s Opp'n at 38.

Even construing the Second Amended Complaint liberally, as it must, the Court concludes that the plaintiff has provided no factual allegations linking the alleged termination of

---

[20] Although neither the defendant nor the Court can locate the emails the plaintiff represents are included in his exhibits, the Court will accept these allegations about the content of the emails as accurate.

his health benefits to his race, which precludes the Court from concluding that his allegations raise "an inference of discrimination[.]" Walker, 798 F.3d at 1091 (citing Stella, 284 F.3d at 145). At no point does the plaintiff provide any more than conclusory allegations that the alleged cancellation of his medical benefits was based on his race or that it was in retaliation for specific protected activity the plaintiff engaged in. See 2d Am. Compl. at 40–42; Pl.'s Opp'n at 37–40. Although the plaintiff references email exchanges with members of the Department's Human Resources office, he does not allege that any of these individuals harbored any antipathy towards him based on his race or his protected activity; that they even knew of his protected activity; or that they were directed to cancel his health benefits coverage by one of his supervisors who he alleges harbored such antipathy towards him. See 2d Am. Compl. at 40–42; Pl.'s Opp'n at 37–40. Therefore, without more, the Court concludes that it must dismiss the component of the plaintiff's discrimination and retaliation claims based on the alleged temporary termination of his health benefits coverage.

### 8. Failure to Investigate (Claim 11)

The plaintiff next alleges that Mr. Barton's "fail[ure] to investigate his concerns" regarding Ms. Van Alstyne's supervision of him amounted to discrimination and retaliation.[21] 2d Am. Compl. at 44. Fatal to this component of the plaintiff's discrimination and retaliation claims is that it is well-established that an agency's alleged failure to investigate a complaint submitted by the plaintiff regarding the conduct of another employee, without some showing of harm, does not support a Title VII discrimination claim. See Akosile v. Armed Forces Retirement Home, 141 F. Supp. 3d 75, 93 (D.D.C. 2015) (quoting Runkle v. Gonzales, 391 F.

---

[21] The plaintiff alleges that Mr. Barton "falsely testified that the plaintiff 'never directly delivered to him an allegation of harassment . . . ." Pl.'s Opp'n at 44. However, as previously indicated, the plaintiff's allegations that Mr. Barton provided false testimony during the EEO process are not relevant to this Court's analysis at this stage.

33

Supp. 2d 210, 223 (D.D.C. 2005)). Similarly, "for a failure to investigate to constitute a materially adverse action[ for the purpose of pursuing a retaliation claim], a plaintiff must explain how that failure led to 'demonstrable harm' or 'made it more difficult for [him] to pursue [his] claims with the EEOC or otherwise assert [his] rights." Boyd v. District of Columbia, No. 22-cv-3741 (RC), 2024 WL 324109, at *7 (D.D.C. Jan. 29, 2024) (citations omitted). Here, the plaintiff has failed to allege any facts that would support a showing of "demonstrable harm" or increased difficulty in asserting his rights. Id. And, he acknowledges that he was reassigned to a new supervisor based on his concerns with Ms. Van Alstyne's supervision, see 2d Am. Compl. at 44, which undercuts his allegation that Ms. Van Alstyne was given a "free hand" to continue harassing him, such that it would constitute a materially adverse action, see id. at 43. Therefore, the Court must dismiss the components of the plaintiff's discrimination and retaliation claims based on the Department's alleged failure to investigate the purported harassment and discrimination he reported to Mr. Barton.

### 9. Questioning the Plaintiff About His EEO Claim (Claim 13)

Finally, the Court turns to the plaintiff's allegation that Ms. Van Alstyne unlawfully "questioned him about his [ ] EEO complaint during a performance appraisal plan meeting[,]" which he contends constituted interference with the EEO process. 2d Am. Compl. at 46. Specifically, the plaintiff alleges that during that meeting, "Ms. Van Alstyne questioned him about his harassment and discrimination complaint, asked him why he was complaining about harassment, and asked him to sign his EPAP[,]" id., which the plaintiff refused to do, indicating that "he felt he was under duress from her[,]" id.[22]

---

[22] The plaintiff further alleges that he was subsequently issued a letter notifying him of his right to "a reasonable amount of official time to present complaints, respond to agency requests for information, prepare documents, and

(continued . . .)

The defendant argues that the plaintiff's allegation of interference in the EEO process is barred because retaliation claims predicated on allegations that the defendant "delay[ed] and undermin[ed] the investigation of [his] complaint" are "improper." Def.'s Mot. at 26 (quoting Briscoe v. Kerry, 111 F. Supp. 3d 46, 59 (D.D.C. 2015)). The defendant further argues that, "[e]ven assuming that [the p]laintiff is correct[] that a Department employee interfered with [his] EEO complaint, 'any earlier mishandling is essentially moot' because [he] 'is now already in a federal court on the merits[.]'" Id. at 27 (quoting Jordan v. Summers, 205 F.3d 337, 342 (7th Cir. 2000)).

However, the Court cannot agree with the defendant's position. First, as other members of this Court have noted, "although some prior decisions in this district have suggested that the improper processing of an administrative complaint cannot constitute a materially adverse action sufficient to sustain a claim of retaliation, support for that proposition ultimately stems from Keely v. Small," which pre-dated the Supreme Court's decision in Burlington Northern, in which the Supreme Court clarified that materially adverse actions in the retaliation context are broader in scope than adverse employment actions in the discrimination context. Lawson v. Sessions, 271 F. Supp. 3d 119, 141 (D.D.C. 2017) (citing Keeley v. Small, 391 F. Supp. 2d 30, 45 (D.D.C. 2005)); see Harrigan v. Carson, No. 17-cv-930 (TJK), 2019 WL 4737119, at *4 (D.D.C. Sept. 28, 2019) (concluding the same). Thus, "in light of Burlington Northern, [a] plaintiff[] [is] not categorically barred from pleading a retaliation claim based on interference with the EEO process." Harrigan, 2019 WL 4737119, at *4.

---

(. . . continued)
attend meetings[,]" but advising him that he "must seek and receive prior approval from [his] supervisor to attend to these matters" and that his supervisor "may limit your time to a reasonable amount." 2d Am. Compl. at 46.

Here, the crux of the plaintiff's allegation is that Ms. Van Alstyne, his supervisor, questioned him about his EEO complaint and "asked him why he was complaining about harassment" during a meeting about his performance appraisal plan, 2d Am. Compl. at 46, not that the Department's EEO office or the EEOC mishandled his complaint. Thus, construing the Second Amended Complaint liberally, as it must, Erickson, 551 U.S. at 94, the Court concludes that it is plausible that Ms. Van Alstyne's questioning of the plaintiff about "why he was complaining about harassment" during a meeting about his performance expectations, 2d Am. Compl. at 46, might "discourage an employee . . . from bringing [EEO] discrimination charges" that he otherwise would bring, Burlington N. & Santa Fe Ry., 548 U.S. at 70–71. While discovery may clarify the content and nature of Ms. Van Alstyne's purported questions about the plaintiff's EEO activities, at this early stage of the case, the Court must deny the defendant's motion to dismiss the component of the plaintiff's retaliation claim based on Ms. Van Alstyne's questioning about his EEO complaint.

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that it must grant in part and deny in part the defendant's motion to dismiss the plaintiff's Second Amended Complaint.

**SO ORDERED** this 13th day of April, 2026.[23]

REGGIE B. WALTON
United States District Judge

---

[23] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.